[ECF Nos. 3, 17]

## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | Misc. No. 24-mc-66 (EAP) |
| INSPECTION WARRANT, | |
| Defendant. | |

## OPINION

This matter has been opened to the Court on the Motion by Curaleaf NJ Inc. also d/b/a Curaleaf NJ II, Inc. ("Curaleaf"), ECF No. 3, to Quash the Sealed Warrant Application for Lack of Administrative Probable Cause. The United States of America filed opposition, ECF No. 9; Curaleaf filed a supplemental memorandum in support of its Motion, ECF No. 10; and the United States filed opposition to Curaleaf's supplemental memorandum, ECF No. 14. Curaleaf currently seeks leave to file a reply brief, ECF No. 17. Having considered the parties' submissions, and having heard oral argument on the issues, and for the reasons set forth below, the Motion to Quash is **DENIED** and the Motion for Leave to File a Reply Brief is **DENIED**.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.    Regulatory Backdrop

Congress enacted the Occupational Safety and Health Act of 1970 (the "OSH Act"), 29 U.S.C. §§ 651-678, "to assure so far as possible every working man and woman in the Nation safe and healthful working conditions." 29 U.S.C. § 651(b). The OSH Act authorizes the Secretary of Labor ("Secretary") "to set mandatory occupational safety and health standards." *Id.* § 651(b)(3).

To enforce these standards, the OSH Act empowers the Secretary to enter "any factory, plant, establishment, construction site, or other area, workplace or environment where work is performed by an employee of an employer" to "inspect and investigate."  29 U.S.C. § 657(a)(1)-(2).  The OSH Act further permits the Secretary to "prescribe such rules and regulations as he may deem necessary to carry out their responsibilities under this chapter, including rules and regulations dealing with the inspection of an employer's establishment."  *Id.* § 657(g)(2).  The Secretary has delegated this rulemaking authority and enforcement responsibility to the Assistant Secretary for Occupational Safety and Health, who heads the Occupational Safety and Health Administration ("OSHA").  36 Fed. Reg. 8754-01 (May 12, 1971).

OSHA has developed an inspection and investigation program designed to ensure compliance with the OSH Act.  *See* ECF No. 9-2, Declaration of Marie Lord ("Lord Decl.") ¶ 2.  OSHA has promulgated a Field Operations Manual ("FOM") that "provide[s] OSHA offices, State Plan programs and federal agencies with policy and procedures concerning the enforcement of occupational safety and health standards."  Lord Decl. ¶ 3 & Ex. 1 (OSHA Instruction, FOM).  Under Chapter 2 of the FOM, OSHA uses Site-Specific Targeting ("SST") programmed inspections to determine "whether violations of federal occupational safety and health standards exist or existed at the workplace to which employees may be exposed."  *Id.*  OSHA's general administrative plan, contained in Chapter 2, Section IV.B of the FOM, sets forth the following inspection priorities:  (1) imminent danger; (2) fatality/catastrophe investigations; (3) investigation of complaints/referrals (and accidents and follow-ups); and (4) programmed inspections.  Lord Decl. ¶ 4 & Ex. 2 (FOM).  At the time of the programmed inspection at issue here, inspections for the first three priorities—imminent danger, fatality/catastrophe investigations, and complaints— had already been completed or assigned, or none were pending.  *Id.* ¶ 6.  As such, OSHA's sole

remaining priority at the time of the inspection at issue was programmed inspections. *Id.*

OSHA's Site Specific Targeting Directive No. 23 ("SST-23") became effective as of February 7, 2023. *Id.* ¶ 7 & Ex. 3 (OSHA Instruction, Site Specific Targeting (SST-23)). SST-23 constitutes a programmed inspection plan for non-construction workplaces with twenty or more employees and is based on data received from injury and illness information that employers submitted for calendar years 2019, 2020, and 2021 pursuant to 29 C.F.R. § 1904.41 (governing electronic submission of injury and illness records to OSHA). *Id.* ¶ 8 & Ex. 3. "SST-23 helps OSHA achieve its goal of ensuring that employers provide safe and healthful workplaces by directing enforcement resources to those workplaces with the highest rates of injuries and illnesses." *Id.* ¶ 8 & Ex. 3 at 7, ¶ IX.

SST-23 selects establishments for inspection to include those with high-rates of employee injury and illness and those with upward trending data. *Id.* ¶ 9. In addition, it includes random samples of low-rate establishments as a quality control, as well as non-responsive establishments. *Id.* ¶ 9 & Ex. 3 at 8, ¶ X.A. OSHA's Office of Statistical Analysis ("OSA") "aggregates establishment information to assist in creating inspection lists of establishments with elevated Days Away, Restricted or Transferred (DART) rate[s], together with a random sample of establishments that did not provide the required 2021 Form 300A data to OSHA." *Id.* ¶ 9.

"In order to schedule inspections, OSA provides each Area Office with access to software and databases that include establishments on the inspection list." *Id.* ¶ 10. Using that SST software to randomly select establishments, Area Offices then determine the cycle size based on available resources and geographic range. *Id.* "Within a cycle, the Area Office may schedule and inspect the establishments in any order that makes efficient use of available resources." *Id.* ¶ 10 & Ex. 3 at 9, ¶ XI.B. Once the inspection list is generated, deletions are made in accordance with the

deletion criteria set forth in the Scheduling System for Programmed Inspections and in SST-23, which includes those establishments no longer in business; establishments that received a comprehensive safety and health inspection within the prior thirty-six months; public sector employers; and VPP and SHARP participants.[1]  *Id.* ¶ 11 & Ex. 3 at 13-14, ¶ XII.  Inspections conducted under SST-23 are comprehensive in scope.  *Id.* ¶ 12 & Ex. 3 at 14, ¶ XIII.A.

### B.    The Curaleaf Inspection

Curaleaf operates a facility in Hammonton, New Jersey that grows, processes, and distributes cannabis-based products.  ECF No. 9-7, Declaration of Stella Bradley ("Bradley Decl.") ¶ 3.  According to its 2021 Form 300A data, OSHA considers Curaleaf's workplace a high-rate establishment under SST-23.  Lord Decl. ¶ 9 & Ex. 4 (Curaleaf's 2021 Form 300A data).  On July 29 2021, Curaleaf was randomly selected for inspection from among non-construction establishments with more than twenty employees based on its high reported rates of workplace injuries and illnesses.  *Id.* ¶¶ 7, 15.  The inspection was assigned to OSHA Compliance Safety and Health Officer ("CSHO") Stella Bradley.  *Id.* ¶ 15.

Curaleaf's workplace consists of an approximate 125,000 square foot facility containing twelve grow rooms, a packaging area, offices, a kitchen area, and a break room.  Bradley Decl. ¶ 3.  On July 30, 2024, at 9:40 a.m., OSHA CSHO Bradley arrived at Curaleaf's facility.  *Id.* ¶ 4.

---

[1]    Voluntary Protection Programs ("VPP") "recognize employers and workers in the private industry and federal agencies who have implemented effective safety and health management systems and maintain injury and illness rates below national Bureau of Labor Statistics averages for their respective injuries." https://www.osha.gov/vpp (last visited Mar. 11, 2025), *archived at* https://perma.cc/8DLY-LD3T.  The Safety and Health Achievement Recognition Program ("SHARP") "recognizes small business employers who have used OSHA's On-Site Consultation Program services and operate exemplary safety and health programs. Acceptance of [a] worksite into SHARP from OSHA is an achievement of status that singles [the employer] out among [its] business peers as a model for worksite safety and health." https://www.osha.gov/sharp/ (last visited Mar. 11, 2025), *archived at* https://perma.cc/4B9Z-3JR2.

She presented her credentials, explained that she intended to conduct an OSHA inspection, and stated that she needed to have an opening conference with Facilities Manager Daniel Cassaday and Director of Operations Dennis Johnson.  *Id.*  Cassaday and Johnson asked Bradley to wait until they conferred with management officials.  *Id.* ¶ 5.

At approximately 11:00 a.m., Johnson initiated a Microsoft Teams call with Curaleaf corporate counsel Nick Flores and Compliance Department personnel Matt Lewis.  *Id.*  When Bradley again attempted to initiate an opening conference, Flores insisted that an OSHA supervisor be involved.  *Id.*  Bradley advised OSHA Assistant Area Director ("AAD") Danielle DiGironimo of the situation, and between 11:20 a.m. and 3:00 p.m., several video calls were held with Flores, Lewis, Johnson, AAD DiGironimo, and Susan Jacobs from OSHA's Office of the Solicitor.  *Id.* ¶ 6.  Upon completion of these calls, Bradley waited in the office for the workplace's shop steward until 3:45 p.m.  *Id.* ¶ 7.  She then attempted to have Johnson paged.  *Id.*  Eventually, Bradley left the workplace at 4:00 p.m., without having completed her inspection.  *Id.* ¶¶ 7-8.

From July 30 through August 2, 2024, OSHA's office, along with attorneys from the OSHA Office of the Solicitor, engaged in several discussions and email exchanges with Curaleaf's corporate counsel.  Lord Decl. ¶ 16.  Despite OSHA's attempt to respond to and address Curaleaf's concerns,  Curlaeaf would not consent to OSHA's entry and inspection of the workplace.  *Id.*

OSHA then sought a warrant from this Court to "enter, inspect, and investigate" Curaleaf for compliance with mandatory occupational safety and health standards.  ECF No. 1, Ex Parte Application for Inspection Warrant ("Warrant Application").  On August 9, 2024, the Court issued the inspection warrant ("Warrant").  ECF No. 2 (Warrant for Inspection).  The Warrant authorized OSHA compliance officers to enter Curaleaf's workplace to conduct an inspection "without delay."  *Id.* at 1.

On August 12, 2024, Curaleaf filed the present Motion to Quash OSHA's Warrant for lack of administrative probable cause.  *See* ECF No. 3 ("Curaleaf Mot.").  The United States filed opposition.  *See* ECF No. 9 ("OSHA Opp.").  Thereafter, Curaleaf obtained a copy of the Warrant and Warrant Application and filed a supplemental memorandum raising three new defenses to the Warrant Application.  *See* ECF No. 10 ("Curaleaf Suppl. Mem.").  The United States followed with opposition to Curaleaf's supplemental memorandum.  *See* ECF No. 14.  On October 4, 2024, Curaleaf moved for leave to file a reply brief.  *See* ECF No. 17.  On March 10, 2025, the Court held oral argument on the Motion.  This matter is now ripe for disposition.

## **DISCUSSION**

As noted above, Section 8(a) of the OSH Act, codified at 29 U.S.C. § 657(a), authorizes the Secretary to conduct searches under certain circumstances:

> [T]he Secretary, upon presenting the appropriate credentials to the owner, operator, or agent in charge, is authorized—
>
> (1) to enter without delay and at reasonable times any factory, plant, establishment, construction site, or other area, workplace or environment where work is performed by an employee of an employer; and
>
> (2) to inspect and investigate during regular working hours and at other reasonable times, and within reasonable limits and in a reasonable manner, any such place of employment and all pertinent conditions, structures, machines, apparatus, devices, equipment, and materials therein, and to question privately any such employer, owner, operator, agent, or employee.

Inspections are also mandated under Section 8(f) of the OSH Act, codified at 29 U.S.C. § 657(f), which provides:

> (1) Any employees or representative of employees who believe that a violation of a safety or health standard exists that threatens physical harm, or that an imminent danger exists, may request an inspection by giving notice to the Secretary or his authorized representative of such violation or danger. . . .  If upon receipt of

6

such notification the Secretary determines there are reasonable grounds to believe that such violation or danger exists, he shall make a special inspection in accordance with the provisions of this section as soon as practicable, to determine if such violation or danger exists. . . .

The Fourth Amendment, however, limits OSHA's authority to inspect under these statutory provisions. *Martin v. Int'l Matex Tank Terminals-Bayonne*, 928 F.2d 614, 620 (3d Cir. 1991) (citing *Camara v. Mun. Ct.,* 387 U.S. 523, 534 (1967)). In *Camara v. Municipal Court*, the Supreme Court held that administrative searches conducted without a warrant procedure violate the Fourth Amendment guarantee against unreasonable searches. 387 U.S. at 534. Setting forth the standard for probable cause to support an administrative search warrant, the Court concluded that the "primary governmental interest at stake is to prevent even the unintentional development of conditions which are hazardous to public health and safety." *Id.* at 535. Recognizing the well-established public acceptance of code enforcement inspections, the public interest in abatement of dangerous workplace conditions, and the relatively limited invasiveness of a citizen's privacy through such inspections, the Court concluded that routine, periodic safety code enforcement inspections were reasonable. *Id.* at 537. It further found that probable cause existed for an administrative search "if reasonable legislative or administrative standards for conducting an area inspection are satisfied with respect to a particular dwelling." *Id.* at 538. "Such standards," it remarked, "which will vary with the municipal program being enforced, may be based upon the passage of time, the nature of the building (*e.g.,* a multi-family apartment house), or the condition of the entire area, but they will not necessarily depend upon specific knowledge of the condition of the particular dwelling." *Id.*

Subsequently, in *Marshall v. Barlow's Inc.*, 436 U.S. 307 (1978), the United States Supreme Court found that this relaxed standard of probable cause for an administrative search

warrant applied to OSHA inspections.  *Id.* at 320.  Although the Court determined that the Fourth Amendment applied to OSHA inspections, it rejected the notion that OSHA needed to demonstrate "probable cause to believe that conditions in violation of OSHA exist on the premises."  *Id*.  Rather, the Court held that "a warrant may be based not only on specific evidence of an existing violation but also on a showing that 'reasonable legislative or administrative standards for conducting an . . . inspection are satisfied with respect to a particular [establishment].'"  *Id.* (alteration in original) (quoting *Camara*, 387 U.S. at 538).  Expanding on the second basis, the Court found that a "warrant showing that a specific business has been chosen for an OSHA search on the basis of a general administrative plan for the enforcement of the Act derived from neutral sources . . . would protect an employer's Fourth Amendment rights."  *Id.* at 321 (footnote omitted); *see also Martin*, 928 F.2d at 621 (noting that *Camara*'s relaxed standard for probable cause for administrative search warrants applied to OSHA inspections).

Here, the United States does not argue that the attempted inspection was premised on any suspected violation or dangerous condition under Section 8(f) of the OSH Act.  Instead, the United States relies exclusively on OSHA's authority to conduct inspections pursuant to a neutral administrative plan under Section 8(a).  A permissible administrative plan relies on "either random selection or selection by relevant statistics that have no individual human component for the reason that searches flowing from these types of plans could not be the product of an agency's arbitrary decision."  *Trinity Indus., Inc. v. Occupational Safety & Health Rev. Comm'n*, 16 F.3d 1455, 1463 (6th Cir. 1994) (Batchelder, J., concurring).

Curaleaf sets forth several arguments for quashing the Warrant Application.  First, Curaleaf contends that SST-23 is unconstitutional because it confers discretion on OSHA to select which establishment to search and the type of inspection it initiates.  Curaleaf Mot. at 3-4.  Second,

Curaleaf claims that because the basis for OSHA's characterization of Curaleaf as a "high-rate establishment" is unknown, then the basis for the inspection is impermissibly discretionary. Curaleaf Mot. at 5; Curaleaf Suppl. Mem. at 2.  Third, Curaleaf asserts that the SST has no logical connection to OSHA's mission and stated purpose and therefore, exceeds OSHA's statutory authority.  Curaleaf Suppl. Mem. at 4-5.  Finally, Curaleaf avers that even if the SST is deemed valid, the Warrant Application itself sought a "general warrant," thereby violating the Fourth Amendment's Particularity Clause.  Curaleaf Suppl. Mem. at 6-7.  The Court addresses each argument in turn.

A.    **Constitutionality of the SST**

Curaleaf first attacks the constitutionality of the SST on which OSHA premised its request for an inspection warrant.  Specifically, Curaleaf contends that SST-23 grants OSHA discretion to select which establishments to search and the type of inspection it initiates.

1.    Discretion over Selecting Which Establishments to Search

SST-23 states in pertinent part:

> [Area Offices] must generate inspection cycles using the SST software that randomly selects the establishments and shall determine inspection cycle size (i.e., 5 to 50 establishments) based on available resources and the geographic range of the office. Larger generated cycles will allow greater flexibility and efficiency of scheduling.  Once initiated, however, the entire cycle must be completed.  If a cycle larger than 50 establishments would provide the [Area Offices] with more efficient use of staff, the office must first request Regional Office approval.
>
> Within a cycle, the [Area Office] may schedule and inspect the selected establishments in any order that makes efficient use of available resources.
>
> . . . .
>
> An [Area Office] must inspect all establishments on the SST inspection list unless, in consideration of available resources, such as implementing ongoing agency emphasis programs, the Regional

> Administrator authorizes the [Area Office] to conduct a smaller number of inspections from the list. Such authorization will normally require the [Area Office] to complete all inspections in the current cycle. . . .

Lord Decl., Ex. 3, ¶¶ B, F.2.

Curaleaf contends that allowing OSHA employees to determine the number of establishments to inspect, create a list of such establishments, decide whether to inspect those establishments, and then choose the order of those inspections "is exactly the type of 'human' component rendered unconstitutional by *Barlow's* and its progeny." Curaleaf Mot. at 3. Curaleaf further argues that "[t]he practical implication of this SST is that OSHA personnel can continue to create lists and decide not to inspect any of the establishments on those lists until their computer 'automatically' generates a list which contains an employer that they are targeting," and then they can decide to inspect that employer first. *Id.*

The Court finds that Curaleaf mischaracterizes OSHA's inspection plan. As explained by AAD Marie Lord, SST-23 simply helps OSHA direct resources to those workplaces with the highest rates of injuries and illnesses by selecting individual establishments for inspection based on the required submission of injury and illness information for the three preceding calendar years. Lord Decl. ¶ 8. OSHA's Office of Statistical Analysis ("OSA") aggregates establishment information "to assist in creating inspection lists of establishments with elevated Days Away, Restricted or Transferred ('DART') rate[s], together with a random sample of establishments that did not provide the required [data] to OSHA." *Id.* ¶ 9. For data accuracy verification and for quality control purposes, OSA also includes a random sample of low-rate establishments. *Id.*

To schedule inspections, OSA provides each Area Office with access to software and databases with establishments on the inspection list. *Id.* ¶ 10. Using the SST software, Area Offices generate inspection cycles through a random selection of establishments and "determine[]

the cycle size based on available resources and geographic range." *Id.* A cycle is generated once the Area Office generates an SST Inspection List. *Id.* ¶ 11. Deletions are then made in accordance with the deletion criteria set forth in the Scheduling System for Programmed Inspections. *Id.* The Area Office's sole discretion is to determine the order of the inspections on the list to make efficient use of available resources. *Id.* ¶ 10.

In this case, "OSA provided the SST-23 Inspection List for Fiscal Year 2021 to the Marlton Area Office for the Area Office's enforcement area." *Id.* ¶ 13. The Marlton Area Office then generated Cycle June 2024, which contained seven establishments for inspection. *Id.* The Marlton Area Office made appropriate deletions in accordance with SST-21, paragraph XII.A. *Id.* After the Marlton Area Office applied the deletion criteria, Curaleaf remained on the Cycle June 2024 list. *Id.*

Based on AAD Lord's Declaration, the Court finds that Curaleaf was chosen for inspection based on an administrative inspection plan containing neutral criteria. SST-23 does not infuse any human, non-neutral element into the process, other than a determination of the order in which the selected establishments will be inspected to preserve resources. Curaleaf's reliance on the Sixth Circuit case of *Engineering & Manufacturing Services, LLC v. Ashton*, 387 F. App'x 575 (6th Cir. 2010) to substantiate its position is misplaced. In *Ashton*, the plaintiff brought an action under 42 U.S.C. § 1983 arising from the Cleveland Fire Department's attempted comprehensive administrative search of the plaintiff's plant. *Id.* at 577. Plaintiff claimed that the affidavit in support of the warrant failed to establish probable cause. *Id.* The district court denied plaintiff's motion for partial summary judgment on the warrant issue and granted summary judgment in favor of defendants. *Id.* at 578. The district court found that Cleveland's Codified Ordinance authorized the fire department's annual inspections of industrial sites to look for hazardous or dangerous

conditions.  *Id.* at 578.  The Sixth Circuit, applying the standards in *Barlow's*, reversed and remanded.  *Id.* at 585.  The court found that although a plan to search commercial buildings annually could arguably be neutral if it rendered the "'whom to search and how often to search' non-discretionary," the plaintiff had produced evidence that the fire department only inspected "a small fraction of buildings annually and, in reality, [the captain] and several others select[ed] the buildings to be inspected without neutral selection criteria."  *Id.*  The court determined that because the fire department's annual inspections were only a "goal," and because the captain and others had input into the choice of buildings to be inspected, "the Fire Department's administrative plan for annual inspections ha[d] human input and components" and thus, lacked neutrality.  *Id.*

By contrast here, the only human component of the SST involves the selection of the inspection cycle size based on available resources and the geographic range of the Area Office. Unlike the selective annual inspections conducted in *Ashton*, once the cycle size is selected, the SST software randomly selects the establishments to be inspected.  Once a cycle is initiated, "the entire cycle must be completed."  Lord Decl., Ex. 3 at 9, ¶ XI.B.  For this reason, the Area Office cannot select which establishments are actually inspected—it only has discretion to direct the order in which those inspections are completed to ensure efficient resource allocation.  Lord Decl. ¶ 10 & Ex. 3 at 9, ¶ XI.B.  While an Area Office can seek approval from the Regional Administrator to conduct a smaller number of inspections from the list, the SST provides that "[s]uch authorization will normally require the [Area Office] to complete all inspections in the current cycle."  Lord Decl., Ex. 3 at 12, ¶ XI.F.2.  Moreover, the SST prohibits Area Offices from creating cycles manually.  *Id.*, Ex. 3 at 10, ¶ XI.C.  It further directs Area Offices to maintain all "inspection lists, cycles, and documentation for a period of three years."  *Id.*, Ex. 3 at 9, ¶ XI.A.  Accordingly, Curaleaf's speculation that OSHA personnel can simply regenerate lists until one contains a

12

targeted employer finds no support in any authority. The Court finds that no discretionary component exists in OSHA's ability to determine which facilities to search.

2. Discretion over the Type of Inspection to Initiate

With respect to the type of inspection that must be conducted, SST-23 states in pertinent part:

> SST inspections shall be comprehensive in scope. An [Area Office] may open an inspection conducted under this program as either a comprehensive safety or health inspection, based on the [Area Office's] knowledge of the workplace's potential hazards. During the course of an inspection the scope may be expanded in accordance with the FOM. In addition, if the site has been inspected previously, the [Area Office] may expand the inspection to cover both health and safety hazards based on violations from that prior inspection. The [Area Office] must fully explain and document in the file the rationale for the expanded inspection.

Lord Decl., Ex. 3 at 14, ¶ XIII.A.

Here, Curaleaf argues that "[a]llowing OSHA to initiate a comprehensive inspection, and then expand or alter the inspection based on 'the Area Office's knowledge' or 'the Field Operations Manual,' or 'violations from [a] prior inspection' all involve OSHA's discretion and is therefore unconstitutional." Curaleaf Mot. at 4 (some alterations in original). The Court disagrees.

In *Barlow's*, the Supreme Court distinguished between inspections based on a neutral administrative plan and those initiated because of purported violations of the OSH Act, including complaints. 436 U.S. at 320-21. For a complaint inspection, the inspection "must bear an appropriate relationship to the violation alleged in the complaint." *Donovan v. Sarasota Concrete Co.*, 693 F.2d 1061, 1068 (11th Cir. 1982) (citations omitted). For purposes of an administrative plan-based search—such as the one at issue here—"[b]ecause administrative and legislative guidelines ensure that employers selected for inspection pursuant to neutral administrative plans have not been chosen simply for the purpose of harassment, . . . administrative plan searches may

properly extend to the entire workplace." *Trinity Indus.*, 16 F.3d at 1460 (citing *Donovan*, 693 F.2d at 1068 (11th Cir. 1982)).[2]

As noted above, SST-23 provides that inspections "shall be comprehensive in scope." Lord Decl. ¶ 12 & Ex. 3 at 14, ¶ XIII.A.  Because OSHA's investigation of Curaleaf is premised on neutral administrative standards, OSHA has the right to conduct a comprehensive search of Curaleaf's establishment without offending Curaleaf's Fourth Amendment rights.  And although the Marlton Area Office may choose to conduct a more limited investigation, such a narrowed investigation does not violate Fourth Amendment principles.[3]

**B.    Whether Inclusion of Curaleaf Within the SST Meets the Neutrality Requirement**

In its next challenge to the Warrant Application, Curaleaf notes that under the SST, establishments are selected for inspection based on "Days Away, Restricted, or Transferred (DART) rates," the numbers for which are determined from data reported by each establishment. Curaleaf Mot. at 5.  Inspections are then initiated at high-rate establishments that meet a certain threshold, upward trending establishments that meet a certain threshold, low-rate establishments that meet a certain threshold, and establishments that fail to provide the required data. *Id.* at 5.

Against this backdrop, Curaleaf argues that when OSHA approached it to initiate its inspection based on Curaleaf's status as a "high-rate establishment," counsel for Curaleaf asked what the threshold DART rate was. *Id.*  When the OSHA counsel responded that she did not know

---

[2]    Curaleaf cites *Trinity Industries* in support of its argument that the scope of OSHA's inspection is discretionary and thus violates the Fourth Amendment.  Curaleaf Mot. at 2.  Unlike here, however, *Trinity Industries* addressed the scope of an inspection initiated by an employee complaint. *Trinity Indus.*, 16 F.3d at 1457.

[3]    Notably, any expansion of an OSHA inspection under the FOM is permitted only where specific evidence gathered during the inspection process substantiates the expansion.  OSHA FMO, Ch. 3, ¶ III.B.2, https://www.osha.gov/fom/chapter-3 (last visited Mar. 12, 2025), *archived at* https://perma.cc/N4B6-6G2J.

the threshold, Curaleaf refused the inspection because "it's impossible to know if Curaleaf fits within the administrative plan selection process outlined by the SST without knowing that threshold DART rate number." *Id.* Curaleaf further argues that the affidavit in support of the Warrant Application makes no mention of the threshold for a "high-rate" establishment. Curaleaf Suppl. Mem. at 3. According to Curaleaf, "without identifying the threshold DART rate applied to justify putting Curaleaf in the 'high-rate' establishment inspection pool," OSHA is asking the Court to "take OSHA's word" that Curaleaf is a high-rate establishment. *Id.* In turn, Curaleaf posits that evaluating the validity of the inspection and OSHA's Warrant Application is impossible. *Id.* at 4.

The Seventh Circuit addressed a similar argument in *Matter of Establishment Inspection of Gilbert & Bennett Manufacturing. Co.*, 589 F.2d 1335, 1341 (7th Cir. 1979). There, OSHA attempted to conduct an administrative inspection of Chromalloy American Corporation ("Chromalloy"). *Id.* at 1337. After Chromalloy refused to consent, OSHA obtained a warrant based on probable cause. *Id.* The warrant affidavit stated that "the inspection was part of a 'National-Local plan designed to achieve significant reduction in the high incidence of occupational injuries and illnesses found in the metal-working and foundry industry.'" *Id.* at 1341-42. Chromalloy contested the affidavit, arguing this paragraph was ambiguous and failed to prove the hazardous nature of its establishment or the foundry industry. *Id.* at 1342. Chromalloy further argued that warrant application failed to allege that the "high" incidence of injuries was a result of violations of OSHA standards. *Id.* The Seventh Circuit rejected that argument, noting that every time OSHA sought a warrant, it would have to provide "a complete set of updated industry statistics, the validity of these statistics, the rationale for applying a particular index factor to the foundry industry, and the reason for inspecting foundries in lieu of another industry." *Id.* Although

the court noted that such a "massive evidentiary showing of particularized cause" might be required "when OSHA standards are being established or judicially reviewed," it was not required to establish probable cause for an administrative warrant. *Id.*  Rather, the court remarked that "the magistrate could rely on the known expertise of the Secretary in gathering the statistics in the area of occupational injuries and his ability to form a reasoned opinion that this rate indicated a 'high incidence' of injuries in the foundry industry." *Id.* at 1343.  The court concluded that "[w]ere this court to require, prior to the issuance of a warrant inspection, the detailed information which would inevitably result from such a hearing, we would be imposing on the Secretary an unwarranted 'consumption of enforcement energies' which would 'exceed manageable proportions.'" *Id.* at 1342.

Subsequently, in *Pennsylvania Steel Foundry and Machinery Co. v. Secretary of Labor*, 831 F.2d 1211 (3d Cir. 1987), the Third Circuit Court of Appeals considered a similar argument. There, OSHA selected Pennsylvania Steel Foundry and Machinery Company ("Penn Steel" for an inspection, to which Penn Steel refused to consent. *Id.* at 1212.  Thereafter, OSHA obtained an administrative inspection warrant. *Id.*  Penn Steel argued that because OSHA's warrant application "provided no explanation of why [it], in particular, was chosen for an NEP [National Emphasis Program] inspection, it [could not] serve as the basis for probable cause under *Barlow's*." *Id.* at 1214.  Citing to *Gilbert & Bennett*, as well as cases from the Ninth and First Circuits, the court noted that "[a]t least three circuits have upheld inspections pursuant to warrants which were based on the fact that the establishment fell within a particular OSHA enforcement plan." *Id.* at 1215 (citing *Gilbert & Bennett*, 589 F.2d 1335; *Stoddard Lumber Co. v. Marshall*, 627 F.2d 984 (9th Cir. 1980); *Donovan v. Enter. Foundry, Inc.*, 751 F.2d 30, 33 (1st Cir. 1984)).  While recognizing the existence of contrary authority, the Third Circuit ultimately sided with cases holding that "an

16

application describing an administrative plan and stating that the worksite to be inspected is within that plan is sufficient for a showing of probable cause." *Id.*  In so doing, the court explicitly rejected the contrary authority, which held that a warrant application must either "explain why inspection of a particular establishment is within [the] program" or present evidence showing that "the administrative standards are being applied to a particular establishment in a neutral manner." *Id.* (rejecting *Brock v. Gretna Mach. & Ironworks, Inc.*, 769 F.2d 1110, 1112 (5th Cir. 1985); *In re Establishment Inspection of Urick Prop.*, 472 F. Supp. 1193, 1105-96 (W.D. Pa. 1979); *Marshall v. Weyerhaeuser Co.*, 456 F. Supp. 474, 484 (D.N.J. 1978)).[4]

Here, the affidavit in support of the Warrant Application provided that the inspection was being conducted pursuant to a neutral general administrative plan for enforcement of the Act.  *See* ECF No. 9-1, *Ex Parte* Application for Inspection Warrant, ¶ 10.  The affiant, Julie Su, Acting Secretary of Labor, stated:

> In this case, OSHA has probable cause to inspect [Curaleaf's] workplace because the inspection is being conducted pursuant to a neutral general administrative plan for the enforcement of the Act. *See* Lord Decl. ¶¶ 7-8.  Under OSHA's SST-23 inspection program for planned inspections, the workplace at issue was randomly selected via a list of non-construction workplaces that have 20 or more employees generated from objective data from injury and illness information that employers submitted to OSHA pursuant to 29 C.F.R. § 1904.41.  *Id.* ¶¶ 8-15.  Curaleaf was randomly selected for inspection from among employers that had reported high rates of workplace injuries.  Where an employer is randomly selected for

---

[4]    *Accord Nat'l Eng'g & Contracting Co. v. Occupational Safety & Health Rev. Comm'n*, 45 F.3d 476, 480 (D.C. Cir. 1995) (holding that OSHA can establish probable cause by "simply attesting that the worksite fits" within a neutral inspection program and need not explain how the particular institution being inspected was chosen for inspection under the program); *Stoddard Lumber Co.,*, 627 F.2d at 988-89 (finding probable cause for issuance of a warrant where OSHA area director provided sworn affidavit, including (1) a detailed explanation of the selection plan; (2) a sworn statement that the facility was selected pursuant to that plan without influence of any other factors; and (3) a statement that the injury incident rate in the facility's industry was 1.8 times the national injury rate for the prior year; "the Secretary's failure to provide individual statistics of [an establishment's] business does not make the warrant fatally defective.").

> inspection under a neutral inspection plan, the "administrative
> probable cause" standard is satisfied. . . .

*Id.* "In the context of an administrative probable cause determination . . . the oath of the compliance officer is entitled to great[] weight." *Burkart Randall Div. of Textron, Inc. v. Marshall*, 625 F.2d 1313, 1320 (7th Cir. 1980).

Curaleaf's demand that the Warrant Application explicitly state the threshold for a "high-rate establishment" seeks a level of specificity not required by Fourth Amendment jurisprudence.[5] Rather, as the Third Circuit has held, probable cause only requires that the application describe the administrative plan and state that the worksite to be inspected falls within that plan. The affidavit does so here, and the Court was entitled to rely on that affidavit. Ultimately, "an application describing an administrative plan and stating that the worksite to be inspected is within that plan is sufficient for a showing of probable cause." *Pa. Steel Foundry*, 831 F.2d at 1215. Curaleaf has offered no information to the Court suggesting that Acting Secretary Su's sworn affidavit should be disbelieved.[6]

## C.    Whether the SST Exceeds OSHA's Statutory Authority

Curaleaf next contends that the underlying SST exceeds OSHA's statutory authority. Curaleaf Suppl. Mem. at 4. It argues that OSHA's mandate requires it to "'assure safe and

---

[5]   Curaleaf contends that when OSHA approached Curaleaf to initiate the inspection at issue, Curaleaf asked what the threshold DART rate was for an establishment to be deemed a "high-rate establishment." Curaleaf Mot. at 5. According to Curaleaf, counsel for OSHA did not know, making it impossible for OSHA to meet its burden of showing administrative probable cause. *Id.* An affidavit, however, is not void simply because the affiant does not have personal knowledge of each factual assertion in the warrant application. *Nat'l Eng'g*, 45 F.3d at 480. Rather, "'affiants are entitled to rely on the actions and observations of their fellow OSHA personnel to supplement their own personal knowledge.'" *Id.* at 480-81 (quotation omitted).

[6]   OSHA invites the Court to engage in an analysis under *Franks v. Delaware*, 438 U.S. 154 (1978). Curaleaf, however, does not argue that the information provided was "deliberately false and indispensable to the probable cause determination." *Marshall v. Weyerhaeuser Co.*, 456 F. Supp. 474, 482 n.7 (D.N.J. 1978) (citing *Franks*). Accordingly, the Court declines to convert this argument into a *Franks* issue.

healthful working conditions for working men and women.'" *Id.* (quoting 29 U.S.C. § 651(b)). Yet, according to Curaleaf, OSHA developed an SST that allows it to inspect all establishments, including "high-rate establishments," "upward trending establishments," and "low-rate establishments." *Id.* at 5 & Ex. 1 (Lord Decl. ¶ 9 & Ex. 3 at 8, ¶ X). Curaleaf contends that OSHA's interpretation of its statutory authority to develop this SST is no longer entitled to *Chevron* deference, pursuant to the recent Supreme Court ruling in *Loper Bright v. Raimondo*, 144 S. Ct. 2244, 2265 (2024). Curaleaf Suppl. Mem. at 5. Because "there is no logical connection between OSHA's mission of assuring safe and healthful working conditions for working men and women and its SST, which permits OSHA to inspect *all establishments*, including establishments with safe and healthful working conditions and a low-rate of injury," Curaleaf reasons that the SST is invalid and cannot serve as a lawful basis for the Warrant. *Id.* at 5-6 (emphasis in original).

Curaleaf's argument is misplaced. Congress declared that OSHA's purpose was "to assure so far as possible every working man and woman in the Nation safe and healthful working conditions and to preserve our human resources . . ." 29 U.S.C. § 651(b). The statute further states that "[i]n order to carry out the purposes of this chapter," the Secretary may "enter without delay and at reasonable times any factory, plant, establishment, construction site, or other area, workplace, or environment where work is performed by an employee of an employer" and may "inspect and investigate" all pertinent conditions of employment. 29 U.S.C. § 657(a)(1), (2). Congress directly authorized OSHA to "prescribe such rules and regulations as he may deem necessary to carry out their responsibilities under this chapter, including rules and regulations dealing with the inspection of an employer's establishment." *Id.* § 657(g)(2).

The Third Circuit has observed that both the wording and the legislative history of 29 U.S.C. § 657(a) support OSHA's interpretation that it is "a broad grant of authority to conduct

reasonable inspections." *Martin*, 928 F.2d at 621.  Courts have repeatedly upheld inspection plans

that permit inspections of facilities, whether or not those facilities have known violations, so long

as the plan is neutral and the facility to be inspected was selected by neutral criteria.  *See, e.g.,*

*Nat'l Eng'g*, 45 F.3d at 480 (upholding inspection warrant based on plan that randomly selected

worksites from a commercially published list of current construction projects); *Martin v. Indus.*

*Steel Prods. Co. v. Occupational Safety & Health Admin.*, 845 F.2d 1330, 1333-34 (5th Cir. 1988)

(approving OSHA inspection pursuant to plan that permits inspection of plants listed on a ranking

of "high-hazard" establishments); *Donovan v. Hackney, Inc.*, 769 F.2d 650, 652 (10th Cir. 1985)

(upholding warrant based on random selection through a programmed health inspection plan).

As described in detail above, SST-23 sets forth neutral criteria for programmed inspections

to ensure workplace safety in certain establishments, prioritizing those with a high rate of

employee injury and illness based on upon data submitted by the establishment itself.  While SST-

23 eventually permits OSHA to inspect all establishments, even those with a low rate of employee

injury, that program advances OSHA's congressionally dictated purpose by prophylactically

ensuring "safe and healthful working conditions."  29 U.S.C. § 651(b).  Even in the wake of *Loper*

*Bright* and the abrogation of deference to agency determinations, Curaleaf cites no authority for

the Court to find that Congress's directive to OSHA to promulgate inspection plans under 29

U.S.C. § 657(g) is so ambiguous that this Court could find that SST-23 exceeds OSHA's authority.

### D. Whether the Warrant Application Violates the Fourth Amendment's Particularity Clause by Seeking a General Warrant

Curaleaf's final argument posits that, even if the Court finds that the SST is valid, the

Warrant Application still seeks "an unconstitutional 'general warrant.'"  Curaleaf Suppl. Mem. at

6.  Citing to the Fourth Amendment's Particularity Clause, Curaleaf avers that allowing a general

or comprehensive inspection without constraints based solely on an "acute concern" for safety and

health protections "parallels to 'general search warrants without probable cause' that caused American colonists to rebel against English rule." *Id.* (quoting *In re Urick Prop.*, 472 F. Supp. at 1193-94). Curaleaf then reasons that by failing to specify reasonable limits, the duration, and the manner of the search, the warrant exceeds constitutional bounds. *Id.* at 7.

While administrative inspection warrants must describe the scope of the inspection with particularity, the object of the search also "determines the reasonable scope of the search." *Platteville Area Apartment Ass'n v. City of Platteville*, 179 F.3d 574, 579 (7th Cir. 1999). As noted by the Seventh Circuit, "[i]f you are looking for an adult elephant, searching for it in a chest of drawers is not reasonable." *Id.* at 579. To that end, where administrative warrants specify that the inspector is to search for violations of a particular code or law, that specification particularizes the scope of the search. *Id.* at 580-81; *see also In re Anthony Marano Co.*, 556 F. Supp. 3d 890, 913-14 (N.D. Ill. 2021) (finding that inspection warrant that extended to alleged hazardous working conditions and/or work area, as well as any hazardous work areas, procedures, or conditions in plain view of the inspector, satisfied Fourth Amendment requirements).

Here, the Warrant describes the object of the search as:

> [I]nspect and investigate in a reasonable manner and to a reasonable extent (including but not limited to the questioning privately any employer, owner, operator, agent or employees on the premises during working hours and the taking of photographs, video recording, measurements and samples, which may be done by attaching monitoring devices to employees),[7] the workplace or environment where work is performed by employees, and all pertinent conditions including structures, machines, apparatus, devices, equipment, materials, chemical compounds[,] workplace video surveillance cameras and footage therefrom and all other things therein (including records required by the Act and regulations

---

[7] Curaleaf focuses on this provision of the Warrant and claims that "OSHA, without particularity, also seeks to seize [managers and employees] by placing monitoring devices on them for an indefinite period of time." Curaleaf Suppl. Mem. at 6. The Warrant, however, only permits this inspection to occur "during regular working hours" and on the premises, and does not allow OSHA to detain individuals. *See* ECF No. 2, Inspection Warrant, at 1.

and standards, and other records related to the purpose of the inspection, files[,] papers, processes, controls and facilities, but excluding all employee medical records) **bearing on whether any employer(s) at the workplace is providing to its employees employment and a place of employment that are free from recognized hazards that are causing or are likely to cause death or serious physical injuries to its employees, and whether the employer(s) is obeying the Occupational Safety and Health Standards issued under the Act and the rules and regulations, and orders issued under the Act.**

ECF No. 2, Warrant (emphasis added).  This defined objective cabins the scope of the inspection and therefore, the Court finds that the Warrant comports with the Particularity Clause of the Fourth Amendment.

> ### E.    <u>Curaleaf's Motion for Leave to File a Reply Brief</u>

As a final housekeeping matter, Curaleaf has moved to file a reply brief to the United States's response to Curaleaf's Supplemental Memorandum in support of its motion to quash.  This case has been the subject of extensive briefing.  The United States filed an *ex parte* application for an inspection warrant, after which Curaleaf filed its motion to quash, accompanied by briefing.  The United States filed a brief in opposition, and the Court permitted Curaleaf to file a supplemental memorandum in support of its motion.  The United States was then given leave to address Curaleaf's new arguments in its supplement, after which Curaleaf sought leave to file yet another brief—the fifth in this already prolonged matter.  Curaleaf's certification in support of this Motion identifies no new arguments raised by the United States that justify an additional filing.  Nor does it raise anything that would alter the above discussion.  Accordingly, the Court denies Curaleaf leave to file that reply brief.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court denies Curaleaf's Motion to Quash the Administrative

Inspection Warrant Application.  An appropriate Order follows.


Date: March 14, 2025                                        s/ Elizabeth A. Pascal
                                                            ELIZABETH A. PASCAL
                                                            United States Magistrate Judge

23